METROPOLITAN LIFE INS. CO. v. READ et al. (No. 7544.)

(Supreme Court, Appellate Division, First Department. July 9, 1915.)

MONEY RECEIVED &⟶6—GROUNDS—IMPLIED PROMISE.

> Where a defendant, a minority stockholder of the L. railroad, did not wish the road to consolidate with the N. road, and in opposition thereto, acting with the plaintiff, another minority stockholder, had an expert accountant examine the financial condition of the L. road, other minority stockholders associating themselves with plaintiff and defendant in opposition to the consolidation, and the parties, including the plaintiff, paying the expenses of the accountant's examination in proportion to the amount of their stock, and where the defendant thereafter formed a formal "protective committee," which invited stockholders to deposit their stock under an agreement giving the committee authority to take steps to prevent the consolidation, the plaintiff taking no part in the formation of the committee, and not depositing its stock, and where such committee effected an agreement with both roads, whereby the minority stockholders' shares were purchased and in addition $200,000 paid them to cover the expense of the examination of the condition of the L. road, despite its failure to act with the committee, the plaintiff could maintain assumpsit on an implied promise against the defendant committee for the amount it had contributed to the expense of the examination.

> [Ed. Note.—For other cases, see Money Received, Cent. Dig. §§ 15, 21–27; Dec. Dig. &⟶6.]

Submission of controversy under Code Civ. Proc. §§ 1279–1281, between the Metropolitan Life Insurance Company and William H. Read and others. Plaintiff held entitled to judgment.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and HOTCHKISS, JJ.

John G. Milburn, of New York City, for plaintiff.
Henry W. Taft, of New York City, for defendants.

McLAUGHLIN, J. This is a submission of a controversy under Code of Civil Procedure, §§ 1279–1281. The facts set out in the submission relate to transactions which, in December, 1914, resulted in the consolidation of the New York Central & Hudson River Railroad Company and the Lake Shore & Michigan Southern Railway Company. For some time prior to the consolidation the plaintiff was a minority stockholder in the Lake Shore Company, in which the New York Central Company held about 90 per cent. of the stock. When the consolidation was first proposed, the plaintiff consulted with the

defendant Read, who also was, or represented, a minority stockholder in the Lake Shore Company, as to the course to pursue in order to obtain the best possible terms for the minority stockholders, in the event of such consolidation taking place. The plaintiff and Mr. Read decided it was advisable, as to their respective interests, to have an expert accountant examine the financial condition of the Lake Shore Company and some of its subsidiaries, with the view of ascertaining, so far as could be, the intrinsic value of the stock. Having this object in mind, in the summer of 1913, they employed an accountant to do the work. He collected a great mass of data, which he analyzed in reports and opinions submitted from time to time. In the meantime, other persons interested as minority stockholders associated themselves with Mr. Read and the plaintiff, and since the expenses of the investigation were quite large they were borne by the parties ratably; that is, each paying from time to time installments of $1 per share of stock held. These installments were paid to Mr. Read, who paid the expenses and retained the original material, reports, and data furnished by the accountant. Some time in the early part of 1914, negotiations were commenced with persons representing the interests of the New York Central Company, in which it was first suggested that the stock of the consolidated company should be issued to the Lake Shore stockholders on the basis of 3½ shares for each share of the Lake Shore stock. Subsequently a definite proposition was made for the exchange of stock on the basis of 5 shares of the consolidated stock for each share of the Lake Shore stock. This proposition the plaintiff decided to accept, and in April, 1914, a consolidation agreement between the two companies on that basis was executed.

Mr. Read and the other persons who had associated themselves with him refused to consent to the consolidation on that basis, and in May, 1914, the defendants Read, Evans, and Wood formed what is termed a "protective committee" to represent the rights of the dissenting minority stockholders. They invited all the Lake Shore stockholders to deposit their stock with the committee, under a deposit agreement by which they were given authority to take such steps as they deemed best to prevent the consolidation upon the basis agreed upon between the two companies and to secure more favorable terms, if possible, for the Lake Shore stockholders. The plaintiff took no part in the formation of this committee, having previously announced that it proposed to accept the terms agreed upon by the two companies, and it thereafter ceased to co-operate with the other minority stockholders. It did not deposit its stock with the committee, or take any further steps to prevent the consolidation. It did, however, after the committee had been formed, pay to Mr. Read two installments of $1 per share on the stock held by it to cover the expenses previously incurred, making the total amount which it contributed, as its share of the expenses of the investigation, $24,830. The committee took over all of the materials previously collected, and instituted several proceedings for the purpose of preventing consolidation, which were unsuccessful. It also instituted a proceeding in the state of Ohio for the purpose of having the stock held by the dissenting stockholders

appraised under a statute of that state, by which a stockholder in a railroad corporation, upon its consolidation, may require his stock to be purchased at its highest market value within two years next preceding, instead of exchanging it.

After the proceeding last mentioned was started, an offer was made by the representatives of the railroad companies to purchase the stock represented by the committee at $500 per share, which was its highest market value within the two years next preceding the consolidation agreement, to be paid by a note of the Lake Shore Company two months after date, with interest, and to purchase all the reports and data collected during the investigation for $130,000. This amount represented, as stated by counsel for the committee, the expenses incurred by it and Mr. Read from the time when he and plaintiff first instituted the investigation, and included the $24,830 paid by the plaintiff. When the plaintiff learned of this offer, it at once communicated with Mr. Read, who stated, if it would deposit its stock with the committee, it would be repaid what it had contributed towards the expenses. As the plaintiff was not in a position to deposit its stock, it informed Mr. Read it would not deposit the same, but would claim —and institute an action to recover, if necessary—its share of any amount received by him or the committee in repayment of the expenses. The committee did not accept the offer made by the railroad companies, as first proposed, but almost immediately thereafter it entered into an agreement with the Lake Shore Company by which that company agreed to purchase the deposited stock at $500 per share, giving its two months' note, without interest, and to pay $200,000 in cash for the "data, records, and memoranda of investigations" made for the committee, "or for William A. Read"—the proceedings instituted by the committee to be discontinued and settled in the manner provided in the agreement. In its essential features this agreement differed from the previous offer only in that the note was without interest and the price to be paid for the data, etc., was $200,000, instead of $130,000—the difference of $70,000 being approximately the amount of interest which would have been paid on the note under the original offer. Pursuant to this agreement the committee received the sum of $200,000, which was concededly fixed upon on the basis of the expenses incurred, including the $24,830 paid by the plaintiff. Out of this sum it has paid each of the parties, except the plaintiff, the amount contributed by it towards the expenses. It refuses to repay the plaintiff the amount of its contribution, and the question submitted for our determination is whether it is legally obligated to do so.

It is urged by the defendants that the $200,000 which they received as members of the committee was paid to them as the representatives of the stockholders who had deposited their stock, under the deposit agreement, as part of a settlement of the proceedings which they had instituted in opposition to the consolidation, and for that reason the plaintiff has no legal claim to any part of it, since it did not deposit its stock. This contention overlooks, as it seems to me, a very material consideration involved in the settlement. When the investigation was first instituted there was no formal agreement between the stockholders

interested therein, and their exact relations are difficult to determine. The information which they sought to and did obtain was for their own benefit, and in ratably sharing the expenses they were engaged in what may be termed (in the absence of words better describing it) a joint venture; each, however, being entirely free to act independently. In the exercise of its independent judgment the plaintiff agreed to a basis of consolidation which it considered fair, and the fact that thereafter the other stockholders interested, or some of them, organized the protective committee to continue the venture, does not, it seems to me, materially alter the relations of the parties. After the committee was formed, these relations were defined, and the committee was authorized to act jointly for them all. It was, however, the same venture, now conducted formally, instead of informally, with the committee authorized to act for all. The agreement made by the committee, therefore, was not materially different, so far as the plaintiff is concerned, from an agreement made by the stockholders then interested in the venture, whom the committee represented. The fact that the plaintiff did not participate in the venture after it was formally organized did not, I think, deprive it of any rights which it would otherwise have had, if there had been no such formal organization.

If Mr. Read had continued to conduct matters without the organization of the committee, and had sold the data collected for $200,000, his obligation to reimburse the plaintiff for the amounts it had contributed would, I think, have been clear. The arrangements between the original parties being purely informal, there was no agreement as to the extent of the investigation, or the disposition or ownership of the records compiled, and the information obtained. In refusing to continue to oppose the consolidation, therefore, the plaintiff did not violate any obligation which it was under, nor did it surrender any rights which it may have had. The committee assumed to take over the records, data, etc., and to sell them to the Lake Shore Company; but for reasons already suggested, so far as the plaintiff is concerned, the sale might equally as well have been made directly by the stockholders who continued the venture, who were then represented by the committee. The records made and data collected were valuable, and the plaintiff had paid almost one-fifth of the expenses incident thereto. In assuming to sell the same, the committee, and the stockholders represented by them, could not disregard the plaintiff's interest therein. This was virtually admitted by Mr. Read when he offered to reimburse the plaintiff if it would deposit its stock, although its contribution had all been made toward the expenses incurred prior to the formation of the committee.

It may well be, as contended by the defendants, that the plaintiff, by failing to deposit its stock, was not entitled to any of the advantages or "profits" secured by the committee, and that the Lake Shore Company, when it made the agreement with the committee, was dealing with it as such, and not concerned with the distribution of the amount paid. But the amount paid did not represent profits. The committee represented to the Lake Shore Company that the expenses of compiling the records amounted to $130,000, which included the $24,830 con-

tributed by the plaintiff, and payment for the same was made upon that understanding, representation, and basis. The payment of this sum was not asked or received on any other ground than reimbursement for the actual cost of the work. Under such circumstances, I am unable to see how the committee can, in good conscience, refuse to pay the same over to the plaintiff. This sum represents the amount actually paid by the plaintiff, and should be repaid to it, instead of dividing it among the depositing stockholders as profits.

It may be difficult to state, in words, the precise relation which the committee assumed to the plaintiff when the money was received. It is unnecessary to hold that it received the money as the agent of the plaintiff. It is sufficient that it now has money which, in equity and good conscience, belongs to the plaintiff, and this brings the case within the well-recognized rule that, where one person has in his possession money which he cannot conscientiously retain from another who is equitably entitled thereto, a promise to pay will be implied. Roberts v. Ely, 113 N. Y. 128, 20 N. E. 606. The rule is an equitable one, having its origin in the desire of the court to do justice between parties. As stated by Lord Mansfield in Moses v. Macferlan, 2 Burr. 1005:

"If the defendant be under an obligation from the ties of natural justice to refund, the law imposes a debt and gives this action—assumpsit—founded in the equity of the plaintiff's case as it were upon a contract."

In the present case the facts are unusual, owing to the informality of the relations between the parties prior to the formation of the protective committee. But it seems clear to me that the plaintiff had and retained, after the committee was formed, an equitable interest in the records, data, and the proceeds realized from a sale thereof. The defendants, having sold them upon the avowed basis of their actual cost, ought not to be permitted to escape payment to the plaintiff of the amount contributed by it.

If these views be correct, then it follows that the plaintiff is entitled to judgment against the defendants for the sum of $24,830, with interest thereon from October 21, 1914, without costs; the stipulation providing costs should not be awarded to either party. Settle order on notice. All concur.